**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**VIZALINE, LLC**
**BRENT MELTON**                                                                      **PLAINTIFFS**

**V.**                                      **CIVIL ACTION NO. 3:18-CV-531-LG-RHW**

**SARAH TRACEY, PE;**
**BILL MITCHELL, PE/PS**
**JOSEPH FRANKLIN LAUDERDALE, PE/PS**
**JOSEPH E. LAUDERDALE, PE/PS**
**STEVEN A. TWEDT, PE**
**DR. DENNIS D. TRUAX, PE**
**RICHARD THOMAS TOLBERT, PS**
**JOE W. BYRD, PS**
**SHANNON D. TIDWELL, PS**
**IN THEIR OFFICIAL CAPACITIES**
**AS MEMBERS OF THE MISSISSIPPI**
**BOARD OF LICENSURE FOR**
**PROFESSIONAL ENGINEERS**
**AND SURVEYORS**                                                        **DEFENDANTS**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**Introduction**

Plaintiffs Vizaline, LLC, and Brent Melton (collectively, "Vizaline") respectfully offer the

following points and authorities in support of their opposition to the motion to dismiss filed by the

Defendants. Defendants, all members of the Mississippi Board of Licensure for Professional

Engineers and Surveyors sued in their official capacity (collectively, "the Board"), have

threatened, are threatening, and will continue to threaten Vizaline's First-Amendment-protected

speech. Accordingly, Vizaline filed this federal civil rights action in state court pursuant to 42

U.S.C. § 1983 to have the courts order the Board to halt its violation of Vizaline's federal rights.

The Board has now removed this action to federal court and filed a motion to dismiss on two bases:

First, that it has some ill-defined immunity to the action. And second, that the First Amendment

does not apply to its restriction of Vizaline's speech. Neither of these bare assertions is supported by the law or finds any footing in the facts as pled in the Complaint. Accordingly, and for the reasons set forth below, this Court should deny the Board's motion.

## I.     Factual and Procedural History.

The events leading to this federal civil rights action are set forth at length in the Complaint. *See generally* Dkt. [1-1].

Vizaline is a small, Mississippi-based company, co-owned by Plaintiff Brent Melton and Scott Dow, that provides innovative geospatial imaging services to the banking industry. *Id.* at ¶¶ 9, 17. Vizaline was founded because Brent, who spent a full career working in small community banks in Mississippi and Louisiana, realized that such banks needed a low cost means to interpret and visualize the legal descriptions of their property portfolios. *Id.* at ¶¶ 18, 20. The key to providing this cost-effective information lies in new digital geospatial and visualization tools. *Id.* at ¶ 21. That is where Scott's experience comes in. Scott is an expert in geospatial and remote sensing who has been working in the field for more than two decades. *Id.* at ¶¶ 24-26. Together, Brent and Scott combined their experiences and formed Vizaline. *Id.* at ¶ 27.

Vizaline uses digital geospatial and visualization tools—which are used in a variety of contexts and by a variety of different companies—to take legal property descriptions—called metes and bounds descriptions—and convert those descriptions into easier to understand information: drawings and pictures. *Id.* at ¶¶ 21-22. When banks obtain interests in real property, most often as collateral for mortgages and other loans, they need to know what the property interests actually are—where a given property is relative to other local features, whether it is as big as claimed, etc. *Id.* at ¶¶ 31-32. Banks' loan-review policies require them to survey properties for bigger loans (typically for loans greater than $500,000, but each bank has its own policies).

{JX337438.1}

2

But for smaller loans, conducting property surveys—which are expensive—is not required or financially feasible. *Id.* at ¶¶ 19, 38-40.

Property—especially rural property—is typically described in "metes and bounds" in deeds, easements, and other legal documents. *Id.* at ¶¶ 33-34. These metes and bounds descriptions are established by surveyors. *Id.* at ¶¶ 35. Vizaline does not establish or purport to establish metes and bounds or other legal descriptions of property, nor does Vizaline locate control monuments or measure items that are not defined within the legal description of properties. *Id.* at ¶¶ 36. Rather, Vizaline takes the preexisting metes and bounds descriptions—which are difficult to visualize—and creates a simple map that is easy to understand. *Id.* at ¶ 37.

Specifically, banks hire Vizaline to provide reports on the properties for which a survey is not required by their own policies. *Id.* at ¶¶ 37-42. Banks do this by providing the preexisting legal descriptions of their property from deeds or other legal descriptions to Vizaline. *Id.* at ¶ 43. Vizaline then enters those legal descriptions into its computer program to generate simple graphical renderings of the descriptions and overlay the graphics onto satellite images (like those found on Google Earth) to visualize the property's boundaries and relative location. *Id.* at ¶¶ 44-45. Vizaline flags potential metes and bounds discrepancies illustrated by the drawing—for example, if the metes and bounds descriptions do not close (describe a completed shape) or if they describe the wrong property size—which Vizaline recommends the bank have resolved by attorneys and licensed surveyors who perform a traditional, formal survey. *Id.* at ¶ 46. Vizaline provides the new information it generates to its bank customers in a report called "Viza-Plat" to help the bank better understand its assets, protect its portfolio, and protect its customers. *Id.* at ¶¶ 47-48. Accordingly, Vizaline describes Viza-Plat as "Simply Put – A New Way to Visualize Your Legal Descriptions." *Id.* at ¶ 49. As compared to surveys, Vizaline's services are lower cost

but still provide useful information to the banks. *Id.* at ¶ 51.

That is all that Vizaline does: provide specialized advice—in the form of a map and other information in generates from preexisting information—to their bank customers to help their bank customers better understand their property portfolios. *Id.* at ¶ 60. Vizaline does not market its services as a survey or as a substitute for surveys or claim to be doing surveys. *Id.* at ¶¶ 52-54. Vizaline does not survey property. *Id.* at ¶ 55. It does not locate, relocate, establish, reestablish, lay out or retrace any property boundary or easement. *Id.* at ¶ 56. It does not make any survey for the subdivision of any tract of land, including rights-or-way or easements. *Id.* at ¶ 57. It does not determine the position for any survey monument or reference point. *Id.* at ¶ 58. And it does not set, reset, or replace any survey monument or reference point. *Id.* at ¶ 59.

Neither does Vizaline market or sell its services to the general public; its only customers are, and always have been, banks. *Id.* at ¶¶ 28-30. Banks are sophisticated consumers of Vizaline's reports, have responded well to Vizaline's services, and more and more banks—in Mississippi and elsewhere—want to purchase Vizaline's information services. *Id.* at ¶¶ 50, 60-62.

Even though Vizaline is not conducting surveys or holding itself out as surveyors or as providing surveys, the Mississippi Board of Licensure for Professional Engineers and Surveyors is attempting to stop Vizaline from providing its information services and to penalize it for providing such services. The Board, which regulates the "practice of engineering" and the practice of "surveying," consists, by law, solely of licensed professional engineers and licensed professional surveyors recommended by the private trade-association groups for engineers and surveyors. *Id.* at ¶¶ 13-14. The Board determined that Vizaline's information services constitute the unlicensed practice of surveying and authorized the Attorney General to bring a lawsuit on the Board's behalf seeking an injunction against Vizaline. *Id.* at ¶¶ 66-72. The Attorney General, on

behalf of the Board, did file such a lawsuit, naming both Vizaline and Brent as defendants, seeking both to enjoin Vizaline and Brent from offering their services in Mississippi and to require Vizaline and Brent to "immediately disgorge themselves" of all fees and compensation earned through Vizaline "by returning all amounts to the persons or entities from whom it was received or collected, along with legal interest thereon calculated from the date of receipt until the date of disgorgement." *Id.* at ¶¶ 73-75.

As interpreted and enforced by the Board, Mississippi's surveyor licensing scheme has threatened, is threatening, and will continue to threaten Vizaline's free speech rights. According to the Board, under Mississippi law, only licensed surveyors are allowed to take preexisting legal descriptions of property and use those descriptions to create simple graphical renderings of the descriptions to advise bank clients for compensation. *Id.* at ¶¶ 80-85. Because Vizaline is not licensed, it may not continue to do this in Mississippi. and must also repay every dollar Vizaline has ever earned to its willing customers, even though Vizaline's customers have never complained about Vizaline, continue to be customers of Vizaline, and support Vizaline's business. *Id.* at ¶¶ 76, 78-79.

Because the creation and dissemination of information are speech within the meaning of the First Amendment and the provision of specialized advice to paying customers is speech within the meaning of the First Amendment, Vizaline is defending against the Board's lawsuit and also filed in state court a federal civil rights lawsuit, pursuant to 42 U.S.C. § 1983, to halt the Board's threat to its First-Amendment-protected speech. *See id.* at ¶¶ 89, 91. The Board then removed this action to federal court, pursuant to 28 U.S.C. § 1441, because the claim for relief in Vizaline's complaint is a question of federal law: The Board's liability under 42 U.S.C. § 1983 for violation of Vizaline's federal rights, to wit, the freedom of speech protected by the First Amendment and

made applicable to the states through the Fourteenth Amendment. This motion to dismiss was then filed by the Board. *See* Dkt. [3]; [4].

## II.      Standards Governing the Board's Motion to Dismiss.

Without invoking any Rule of the Federal Rules of Civil Procedure, the Board argues this case should be "dismissed." Given the standard cited by the Board, however, it has brought this motion pursuant to Rule 12(b)(6), of the Federal Rules of Civil Procedure. *See* Dkt. [4] at 2. Under Rule 12(b)(6) a court may dismiss a claim for "failure to state a claim upon which relief can be granted." Motions to dismiss under 12(b)(6) are "viewed with disfavor and [] rarely granted." *Harrington v. State Farm Fire & Cas. Co*., 563 F.3d 141, 147 (5th Cir. 2009). "A claim may not be dismissed [pursuant to Rule 12(b)(6)] unless it appears certain that the plaintiff cannot prove any set of facts in support of her claim which would entitle her to relief." *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017). A complaint need only contain sufficient factual allegations which state "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The facts alleged must "be enough to raise a right to relief above the speculative level," but the complaint may survive a motion to dismiss even if recovery seems "very remote and unlikely." *Twombly*, 550 U.S. at 555-56 (internal quotations omitted)). Thus, the complaint must provide more than "labels and conclusions," but it "need not contain detailed factual allegations.' " *Colony Ins. Co. v. Peachtree Const., Ltd*., 647 F.3d 248, 252 (5th Cir. 2011). Regardless, "all factual allegations are taken as true and construed the facts in the light most favorable to the plaintiff." *Alexander*, 875 F.3d at 249.

Rule 12(b)(6) motions to dismiss based on an affirmative defense—such as immunity—are governed by the same standard and the "defense must appear on the face of the complaint." *Kelly v. Nichamoff*, 868 F.3d 371, 374 (5th Cir. 2017).

Under Rule 12(b)(6), the Board's motion should be denied. First, the Board does not identify any claims for relief in the Complaint to which its assertion of immunity applies and, regardless, the immunities the Board invokes do not apply here. Second, Vizaline has pled cognizable legal theories for relief and the Board's motion both fails to address the controlling precedent and fails to credit the numerous, specific facts Vizaline has set forth to support those cognizable legal theories.

## III.    The Board has identified nothing in the Complaint to which it is immune and the immunity doctrines it invokes do not apply in any event.

Because a federal court should address jurisdiction before the merits, Vizaline first addresses the Board's "immunity" objections to this federal civil rights action: They are without merit. The Board asserts "to the extent the Complaint seeks relief *other* than declaratory or prospective injunctive relief, the Movants are immune from liability under the 11th Amendment to the US Constitution and immune under the provisions of the Mississippi Tort Claims Act, Miss. Code §§11-46-1 et seq." Dkt. [4] at 8 (emphasis added). But the Complaint does not ask for relief beyond declaratory or prospective injunctive and the Board does not identify any claims for relief in the Complaint to which its assertion of immunity would apply. Moreover, the Eleventh Amendment does not apply here and has also been waived by the Board's removal of this case to federal court. In addition, state-law immunity provisions do not apply to this federal civil rights case.

The Board does not identify any claims for relief in the Complaint to which its assertion of immunity applies, because it cannot. First, the Complaint seeks declaratory and injunctive relief

against state officials pursuant to 42 U.S.C. § 1983, which the Board admits is permitted. *See* Dkt. [1-1] at 15, ¶¶ A-B; Dkt. [4] at 8. Second, the Complaint seeks an award of attorneys' fees pursuant to 42 U.S.C. § 1988. Dkt. [1-1] at 15, ¶ C. The Board does not object to this, nor could they. Section § 1988 "imposes attorney's fees 'as part of the costs.' Costs have traditionally been awarded without regard for the States' Eleventh Amendment immunity. . . . The Court has never viewed the Eleventh Amendment as barring such awards, even in suits between States and individual litigants." *Hutto v. Finney*, 437 U.S. 678, 695 (1978). Finally, the Complaint seeks "further legal and equitable relief as the Court may deem just and proper." Dkt. [1-1] at 15, ¶ D. But nothing in this residual prayer for relief can be read to include impermissible relief because such relief would, by definition, not be "proper."

In short, the Board's motion inveighs against unidentified improper relief that the Complaint does not pray for. Because the Board does not identify any claims to which its assertion of immunity applies (because there are none to which it can object), the Board's motion should be denied.

Moreover, the immunities the Board invokes—the Eleventh Amendment and the Mississippi Tort Claims Act—do not apply here.

The Eleventh Amendment does not prohibit § 1983 suits against state officials for declaratory and injunctive relief. *Ex parte Young*, 209 U.S. 123, 155-56 (1908) ("individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten . . . to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action"). As the Supreme Court has most succinctly put it, "when a federal court commands a state official to do nothing more than refrain from violating federal law, [the official] is not the State for sovereign-

immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011). Neither does the Eleventh Amendment prohibit an award of attorney's fees as costs pursuant to § 1988. *Hutto*, 437 U.S. at 695. Moreover, the Board removed this case from state court to federal court, and that removal waived Eleventh Amendment immunity, *Lapides v. Bd. of Regents*, 535 U.S. 613, 619 (2002); *accord Meyers v. Texas*, 410 F.3d 236, 255 (5th Cir. 2005), as the Board itself recognizes. Dkt. [4] at 8 (citing *Meyers*).

In addition, the Mississippi Tort Claims Act cannot apply to this federal civil rights action. State-law immunity doctrines do not immunize state officials from a § 1983 lawsuit. *Felder v. Casey*, 487 U.S. 131, 139 (1988) ("[A] state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state immunity law would thwart the congressional remedy."); *accord Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced." (internal quotation marks omitted)).

Accordingly, the Board has no "immunity" that prevents this Court from hearing this federal civil rights action[1] and its motion to dismiss should be denied.

---

[1] Even if there were such an immunity doctrine, dismissal would *still* not be the appropriate remedy. This case has been removed to federal court by the Board. [DOC 1.] In a case removed from state court, "[]if at any time before final judgment it appears that the district court lacks subject matter jurisdiction the case *shall be* remanded." 28 U.S.C. § 1447(c) (emphasis added). Accordingly, if the Board were correct in its assertions—and it is not—this Court would have to remand, not dismiss.

IV.     **The Complaint states a claim for relief and cannot be dismissed.**

Vizaline's Complaint states a claim for relief—a plausible legal claim supported by sufficient factual allegations—and cannot be dismissed. The Complaint states a plausible legal claim because Vizaline alleges it engages only in speech protected by the First Amendment and that the Board has used state law to attempt to silence them. That claim for relief is supported by existing law and more than sufficient factual allegations, all of which must be "taken as true and construed [] in the light most favorable to the plaintiff." *Alexander*, 875 F.3d at 249. First, Vizaline will show that the creation and dissemination of information is speech protected by the First Amendment and that its factual averments demonstrate that Vizaline is only creating and disseminating such information. Second, Vizaline will show that the Mississippi surveyor licensing law that is restricting Vizaline's speech is subject to First Amendment review under the factual averments in the Complaint and that the Board's arguments to the contrary are not supported by law.

**A. Vizaline only creates and disseminates information, which is protected by the First Amendment.**

As initial matter, Vizaline has pled a plausible legal claim for relief because "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Id*. at 568. This includes restraints on the sale of information. *Id.* at 567. Where a state imposes "content- and speaker-based restrictions on the availability and use of" information, the First Amendment requires the application of "heightened scrutiny." *Id*. at 571.

Here, Vizaline's Complaint claims that "the creation and dissemination of information are speech within the meaning of the First Amendment" and asserts that it only creates and

{JX337438.1}

10

disseminates information. Dkt. [1-1] at ¶ 89. As pled in the Complaint, Vizaline does—and is the subject of enforcement proceedings for doing—only one thing: using existing data and information—legal descriptions of property (generated by licensed surveyors)—to create and disseminate new information—visual depictions of those legal descriptions—to their bank customers to help the banks understand their property portfolios. *Id.* at ¶¶ 35-51; 66-71. Vizaline could use, create, and disseminate information if the subject of that information were not about legal property descriptions or if it were licensed. *Id.* at ¶¶ 92-93. But because Vizaline is speaking about legal property descriptions and is not licensed, the Board says Vizaline may not speak and may be penalized for speaking. *Id*. at ¶¶ 78-85; *see also* Dkt. [3] at 3 ("Mississippi's regulations require a license for those who sale [sic] specialized advice concerning the boundaries of real property and location of real property relative to fixed points. . . .  These regulations require a license for those who sale [sic] plats which reflect—or allow visualization of—the boundaries of real property and the location of real property relative to fixed points.").

The Board does not—as it cannot—dispute Vizaline's factual assertions. Neither does the Board really dispute that the use of information to create and disseminate new information is generally protected by the First Amendment. Rather, the Board summarily asserts that it is regulating an occupation—surveying—and is therefore allowed to restrict Vizaline's speech. Dkt. [4] at 7. The Board is wrong.

## B.  The surveyor licensing laws restricting Vizaline's speech are subject to the First Amendment.

Notwithstanding that the creation and dissemination of information are speech within the meaning of the First Amendment, the Board clearly takes the position that "Mississippi's regulations require a license for those who sale [*sic*] specialized advice concerning the boundaries of real property and location of real property relative to fixed points" and that "[t]hese regulations

require a license for those who sale [*sic*] plats which reflect—or allow visualization of—the boundaries of real property and the location of real property relative to fixed points." Dkt. [3] at 3.] The Board takes this position because it believes that the First Amendment does not restrain its power to license professions. Dkt. [4] at 7. As explained in Part 1, the Board is wrong. Essentially, the Board asserts that it is regulating "conduct" without identifying any "conduct" that Vizaline is engaged in or citing any cases about the difference between "speech" and "conduct," But as explained in Part 2, the Supreme Court's speech/conduct distinction cases demonstrate that, as applied to Vizaline, the Mississippi laws are restricting speech, not conduct. Finally, as explained in Part 3, as applied to Vizaline, the Mississippi laws are not an "incidental" restriction of speech.

### 1.   The Board's arguments are not supported by law.

The Board fundamentally misunderstands the Supreme Court's "professional speech" cases. The Board summarily asserts that Vizaline's Complaint fails to state a claim because the Board is regulating an occupation and is therefore allowed to restrict Vizaline's speech. Dkt. [4] at 7. It relies on only two cases to support its position: *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), and *Hines v. Alldredge*, 783 F.3d 197 (5th Cir. 2015). But *NIFLA* stands for the opposite proposition than what the Board claims and *Hines* has been entirely abrogated by *NIFLA*.

Simply because Vizaline's speech may[2] be subject to Mississippi occupational licensing laws does not strip it of First Amendment protections. *NIFLA* makes this clear: "Speech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 138 S. Ct. at 2371-72. In *NIFLA*, the Court noted that various courts that had permitted "professional speech"—speech

---

[2] In the ongoing enforcement action, Vizaline disputes that its speech is subject to Mississippi surveyor licensing laws at all.

within the context of a licensed profession—to be subjected to lesser protections under the First Amendment. *Id.* at 2371. But the Court rejected "'professional speech' as a separate category of speech." *Id.*; *see also id.* at 2375 ("All that is required to make something a 'profession,' according to these courts, is that it involves personalized services and requires a professional license from the State. But that gives the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement."). Instead, the Court reemphasized the importance of "drawing the line between speech and conduct." *Id.* at 2373. The Court recognized that its "precedents have long protected the First Amendment rights of professionals." *Id.* at 2374. And, pointing to *Holder v. Humanitarian Law Project*, 561 U. S. 1 (2010), the Court further recognized that providing specialized advice to listeners is indeed protected by the First Amendment because it is speech, not conduct. *Id.* at 2374.

    *Hines*—which applies a version of the professional speech doctrine—predates, and has been abrogated by, *NIFLA*.[3] *Hines* held that a licensed veterinarian's First Amendment rights were not implicated by a Texas law that prohibited him from giving advice to clients over the internet because he could not first do a physical examination. *Hines*, 783 F.3d at 200. But in so holding, the Court's analysis started and stopped at the fact that the challenged law was part of the veterinary practice act. *Id.* at 201. The court determined that "[i]f the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny." *Id.* at 202. And the court rejected, without analysis, the speech/conduct distinction drawn by *Holder*. *Id.* at 201-02; n.20. Accordingly, the court determined the

---

[3] Even before being wholly abrogated by *NIFLA*, *Hines* had already been limited by the Fifth Circuit, which had reservations about the "professional speech doctrine." *Serafine v. Branaman*, 810 F.3d 354, 359 & n.3 (5th Cir. 2016).

veterinarian did not have a First Amendment right to advise clients except as that right was governed by the practice act. *Id.* at 202. Given all this, the *Hines* analysis does not survive *NIFLA* and, therefore, cannot support the Board here.

Instead, following *NIFLA*, it is critical for a court to first determine whether, as applied in the case before it, the government regulation is regulating professional speech or professional conduct, because laws which generally regulate conduct can impermissibly regulate speech. If speech is being regulated, with only two narrow exceptions that do not apply here, a content-based regulation of speech by "professionals"[4] is subject to strict scrutiny, just like any other content-based regulation.

### 2.   As applied to Vizaline, the Mississippi law is restricting speech, not conduct.

Where regulated "conduct" consists only of speaking, the First Amendment applies. *Holder*, 561 U.S. at 27-28; *accord NIFLA*, 138 S. Ct. at 2373 ("While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it and the line is long familiar to the bar.") (internal citations and quotations marks omitted). In *Holder*, the Court held that the federal prohibition on providing "material support" to terrorist groups, which is ordinarily a regulation of conduct, was subject to the First Amendment when the "material support" at issue was speech. *Holder*, 561 U.S. at 14-15, 26-27. Thus, even where a statute many "*generally* function[] as a regulation of conduct," where it applies to speech, it is subject to the First Amendment. *Id.* at 27.[5]

Here, as set forth in the Complaint, all that Vizaline is doing is speech. Although the

---

[4] Vizaline could use, create, and disseminate information if the subject of that information is not about legal property descriptions or if Vizaline were licensed. Dkt. [1-1] at ¶¶ 92-93.]

[5] In *Holder*, the material-support ban survived strict scrutiny because it was narrowly tailored to the compelling government interest of "combating terrorism." *Holder*, 561 U.S. at 28-33, 39.

Mississippi's surveyor licensing laws *may* ordinarily regulate conduct—such as the actual performance of surveys—as applied in this case, those laws are regulating speech. Vizaline does nothing more than use preexisting information to create and disseminate new information. Dkt. [1-1] at ¶ 35-51. That is speech. *See* Part IV at A, *supra*. Vizaline does not perform any "conduct" of a surveyor; it does not locate, relocate, establish, reestablish, lay out or retrace any property boundary or easement; make any survey for the subdivision of any tract of land, including rights-or-way or easements; determine the position for any survey monument or reference point; or set, reset, or replace any survey monument or reference point. Dkt. [1-1] at ¶¶ 56-59.] Vizaline's only "conduct" is here speech, and where regulated "conduct" consists of speaking, *Holder* says the First Amendment applies.

### 3. As applied to Vizaline, the Mississippi law is not an "incidental" restriction of speech.

Following *NIFLA*, a content-based regulation of speech by professionals is subject to First Amendment strict scrutiny except in two narrow circumstances, "neither of which turn[s] on the fact that professionals [are] speaking." *NIFLA*, 138 S. Ct. at 2372. The Board possibly argues only one of those exceptions: that "States may regulate professional *conduct*, even though that conduct *incidentally* involves speech."[6] *Id.* (emphasis added); *see also id.* at 273 (citing *Sorrell*, 564 U.S. at 567, for same principle). But the Board's bald assertion that its restriction of Vizaline's speech

---

[6] The exception the Board does not argue applies to "some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *NIFLA*, 138 S. Ct. at 2372. That exception does not apply here because Mississippi's surveyor licensing law is not a disclosure law—the law prohibits speech—and because Vizaline's use, creation, and dissemination of information is not commercial speech. Although Vizaline is engaged in commerce, its speech is not "commercial speech" as the Supreme Court has defined that term. "[T]he core notion of commercial speech [is] speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quotation marks and citation omitted). Here, by comparison, the Board asserts that it may restrict all of Vizaline's speech about legal property descriptions because it is not licensed. Regardless, Vizaline does make certain disclosures about its services and the Board does not take umbrage with any of them. Dkt. [1-1] at ¶¶ 52-54.

is "incidental" to its regulation of professional conduct, to wit, surveying, misses the mark. Dkt. [4] at 7. While it is true that regulations of conduct may sometimes permissibly impose incidental burdens on speech, this is hardly the authorization to regulate all speech the Board suggests. Instead, courts look carefully to make sure that the government is actually regulating conduct and that the burdens on speech are truly incidental. The most recent example of this is *NIFLA*, but *Sorrell* conducted the same analysis. And here, the facts as pled show that Vizaline's case is just like *Sorrell*, where the only "conduct" involved was the creation and dissemination of information for compensation. *See also* Dkt. [3] at 3 (admitting the Board regulates the sale of information based on the content of the information). Just as the First Amendment applied in *Sorrell*, so too does it apply here.

  *NIFLA* makes clear that "incidental" regulations of speech must actually regulate conduct; where there is no conduct to be regulated, the regulation of speech is subject to the First Amendment. In *NIFLA*, California demanded that licensed pro-life pregnancy counseling clinics "disseminate a government-drafted notice on site" regarding abortion services provided by the state. *NIFLA*, 138 S. Ct. at 2369. The Court rejected the argument that the regulation was an "incidental" regulation of speech because there was no non-expressive "conduct" being regulated by California. *Id.* at 2373. As an example of "incidental" regulation, the Court pointed to laws requiring doctors who perform abortions—a type of non-expressive professional conduct—to make certain factual disclosures to their patients about the procedure. *Id.* (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992)). But in *NIFLA*, the regulation was "not tied to a procedure at all," it applied to all interactions between the clinics and their customers, regardless if any procedure was sought. *Id.* Accordingly, the Court determined that California was "regulat[ing] speech as speech." *Id.* at 2374.

{JX337438.1}

16

*Sorrell*, cited approvingly in *NIFLA*, conducted the same analysis and stands for the proposition that a law imposes more than an incidental burden when the "commerce" being regulated is the sale of protected speech. In *Sorrell*, the Vermont law at issue prohibited the sale, disclosure, or use by pharmacies of "prescriber-identifiable information"—valuable, federally required data about the drugs that a given doctor prescribes—for marketing purposes. *Sorrell*, 564 U.S. at 557-59, 580. The law allowed that information to be "sold or given away for purposes other than marketing," including to "private or academic researchers." *Id*. at 562–63. "[I]nsurers, researchers, journalists, the State itself, and others [could] use the information"; in other words, "pharmacies [could] share prescriber-identifying information with anyone for any reason save one: They [could] not allow the information to be used for marketing." *Id*. at 572.

Vermont argued that banning the sale of information for marketing purposes was "a mere commercial regulation," which—if true—would make it permissible for the law to "impos[e] incidental burdens on speech." *Id*. at 567–68. But the Court rejected this argument because a restriction on the sale of protected speech was not an "incidental" restriction. Rather, incidental restrictions are those that spring directly from the regulation of non-expressive conduct. *Id.* This explains the "incidental" burden cases and "why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs, why an ordinance against outdoor fires might prohibit burning a flag, and why antitrust laws can prohibit agreements in restraint of trade." *Id*. at 567 (internal quotation marks omitted) (*citing Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc*., 547 U.S. 47, 62 (2006); *R.A.V. v. St. Paul*, 505 U.S. 377, 385 (1992); and *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949)). The unifying theme to such cases is that they involved conduct—race-based hiring, outdoor fires, and consolidating a monopoly—that did not constitute "speech" under any reasonable definition of that term.

The "incidental" analysis does not apply when the law on its face or in "practical operation" burdens speech "based on the content of speech and the identity of the speaker." *Id.* In *Sorrell*, as here, the speech was being restricted based on its content—there, "prescriber-identifiable information," here, legal property descriptions—and who was doing the speaking—there, pharmacies, here, those without a surveyor license. *Compare id.* at 562-65, *with* Dkt. [1-1] at ¶¶ 78-85, 92-93; *see also* Dkt. [3] at 3 ("Mississippi's regulations require a license for those who sale [*sic*] specialized advice concerning the boundaries of real property and location of real property relative to fixed points. . . .  These regulations require a license for those who sale [*sic*] plats which reflect—or allow visualization of—the boundaries of real property and the location of real property relative to fixed points."). In *Sorrell*, as here, the speech being restricted was "the creation and dissemination of information," which is "speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570; *see also* Part IV at A, *supra*. And again, *Sorrell* recognized that speech that is sold does not lose its First Amendment protection. After all, "a great deal of vital expression" is protected under the First Amendment even if it "results from an economic motive." *Sorrell*, 564 U.S. at 557 (citing *United States v. United Foods, Inc.*, 533 U.S. 405, 410–11 (2001); *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975); and *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964)). Here too, the Board is restricting the sale of information. *See* Dkt. [3] at 3.

Here, as in *Sorrell* and *NIFLA*, the regulation of Vizaline's speech is not incidental to any regulation of Vizaline's conduct. As pled in the Complaint, Vizaline does—and is the subject of enforcement proceedings for doing—only one thing: using existing data and information—legal descriptions of property (generated by licensed surveyors)—to create and disseminate new information—visual depictions of those legal descriptions—to their bank customers to help the banks understand their property portfolios. Dkt. [1-1] at ¶¶ 35-51, 66-71; *see also* Dkt. [3] at 3

("Mississippi's regulations require a license for those who sale [*sic*] specialized advice concerning the boundaries of real property and location of real property relative to fixed points. . . .  These regulations require a license for those who sale [*sic*] plats which reflect—or allow visualization of—the boundaries of real property and the location of real property relative to fixed points."). Nothing in the Complaint asserts that Vizaline is engaged in non-expressive conduct; indeed, the Complaint expressly states that Vizaline is not engaged in such conduct. Dkt. [1-1] at ¶¶ 56-59. This Court must accept those assertions as true. Because the "conduct triggering coverage under the statute consists of communicating a message," *Holder*, 561 U.S. at 28, and there is no non-expressive conduct here, the narrow "incidental" exception to the First Amendment discussed in *NIFLA* and *Sorrell* does not apply.

*     *     *

Accordingly, Vizaline's Complaint states a plausible legal theory: It is engaged in First-Amendment-protected speech and the Board seeks to halt its speech and penalize it for having spoken. Vizaline has pled facts which, if true, support that theory and demonstrate that Vizaline is entitled to relief. *See Alexander*, 875 F.3d at 249; *Colony Ins. Co.*, 647 F.3d at 252. The Board's argument to the contrary finds no footing in the facts or the controlling precedent. Given that motions to dismiss under 12(b)(6) are "viewed with disfavor and [] rarely granted" generally, *Harrington*, 563 F.3d at 147, Vizaline's Complaint should not be dismissed here.

### C.  The Board cannot meet its burden of justifying this restriction of speech in a 12(b)(6) motion.

The Board's motion, but not its memorandum in support, appears to argue that its 12(b)(6) motion should be granted because its regulations are justified. Dkt. [3] at 2-3. To the extent that the Board is arguing that its 12(b)(6) motion should be granted because its regulations are justified, its motion must be denied.

{JX337438.1}

Because this is a Rule 12(b)(6) motion, the question at this stage is not whether the restriction of Vizaline's speech violates the First Amendment; it is only whether the First Amendment "plausibly" applies to Vizaline's speech. And while the Supreme Court has enumerated an array of standards of scrutiny under the First Amendment, every such standard has this in common: it is the government—not the speaker—who bears the burden of meeting that standard. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000). This means the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion). Moreover, "[t]his burden is not satisfied by mere speculation or conjecture . . . ." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

Because no justification for the restriction appears in the Complaint, the Board cannot simply assert them in its Rule 12(b)(6) motion.[7] Accordingly, this Court cannot consider those arguments in making its ruling here.

## CONCLUSION

---

[7] Vizaline further notes that the Board's justification comes down to paternalism: that Vizaline's customers are not smart enough to understand Vizaline's speech. Dkt. [3] at 2-3. But the Supreme Court has rejected the idea that the government has the power to restrict speech in order to protect willing listeners from themselves. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 794 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." (citations omitted)); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good."), quoted with approval in *Sorrell*, 564 U.S. at 577. If the First Amendment does not allow government paternalism to restrict sales of violent video games to minors, *Brown*, *supra*, it is at least "plausible" that the First Amendment also does not allow the Board's paternalism to restrict the sale of useful information about legal descriptions of property to sophisticated banks. Dkt. [1-1] at ¶¶ 29-30, 50.

{JX337438.1}

Vizaline's claim is based on a cognizable legal theory showing a violation of its right to free speech. This claim is supported by an abundance of alleged facts demonstrating how this right has been, is, and will continue to be violated by the Board. *See* Dkt. [1-1] at ¶¶ 78-85. The Complaint does not seek anything other than permitted relief; the Board has no Eleventh Amendment immunity (and waived any it did have by removing this case to federal court) and has no state-law immunity from suit under 42 U.S.C. § 1983. For these reasons, Vizaline requests that this court **DENY** the motion to dismiss.

Respectfully submitted this 29th day of August, 2018.

/s/ Adam Stone
Adam Stone
Jackie R. Bost, II
JONES WALKER LLP
190 East Capitol Street, Suite 800
Jackson, MS 39201
T: 601.949.4900
F: 601.949.4804
astone@joneswalker.com
jbost@joneswalker.com

Paul V. Avelar (AZ Bar No. 023078)*
Institute for Justice
398 South Mill Avenue, Suite 301
Tempe, AZ 85281
T: 480.557.8300
F: 480.557.8305
pavelar@ij.org

*Attorneys for Plaintiffs Vizaline, LLC and Brent Melton*

* Motion for admission *pro hac vice* pending.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing document via the Court's electronic filing system, which forwarded an electronic copy to all counsel of record.

DATED:  August 29, 2018.

/s/ Adam Stone
Adam Stone